USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 04/07/06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

CHAMP HALLETT,

    Plaintiff,

-v-                                  No. 99 Civ. 5853 (LTS)(AJP)

NEW YORK STATE DEPARTMENT
OF CORRECTIONAL SERVICES,

    Defendant.

------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER

In this action brought pursuant to Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 121131, et seq. (the "ADA"), plaintiff Champ Hallett ("Plaintiff or "Hallett"), a former New York State prison inmate, seeks damages on account of the denial to him of access to "Shock Incarceration" and "Work Release" programs during his incarceration. The Court has jurisdiction of the matter pursuant to 28 U.S.C. §§ 1331 and § 1343. Defendant New York State Department of Correctional Services ("Defendant" or "DOCS") moves for summary judgment dismissing Hallett's claim. For the reasons explained below, Defendant's motion is denied. Plaintiff's cross-motion to strike certain portions of DOCS's affidavits in support of its motion is also denied, without prejudice to litigation of the evidentiary issues raised therein in connection with further proceedings in this case. The Court has considered carefully all of the parties' extensive evidentiary and argumentative submissions in its determination of these matters.

### BACKGROUND

The following material facts are undisputed except as otherwise noted. From May 20,

1997, until September 17, 1997, Plaintiff Champ Hallett was incarcerated at the Elmira Reception Center/Correctional Facility and, from September 17, 1997, until March 2, 2000, Plaintiff was incarcerated at Green Haven Correctional Facility.

Hallett, at all relevant times, used a wheelchair or prosthetic leg for mobility, on account of an above-the-knee amputation of his right leg in connection with a serious fall prior to his incarceration. It is also undisputed that he had suffered an aortal aneurism, which was surgically repaired, as well as injuries to his left ankle (also surgically repaired with pins), and fractured the L-3 vertebra in his back in connection with that same incident. Plaintiff had been diagnosed with high blood pressure on at least one occasion prior to his DOCS incarceration. Plaintiff has also been HIV-positive since before his incarceration, although he has never been symptomatic and was not on an HIV-related drug regimen at the time of his original admission to DOCS custody. DOCS' medical records also indicate that Plaintiff carried the sickle cell anemia trait from the time of his admission. At the time he was admitted to DOCS custody via the Reception facility at Elmira, New York ("Reception"),[1] Hallett was taking two prescription medications -- Motrin and Colace (a stool softener). He was also taking vitamins and using non-prescription topical hemorrhoid medication and possibly a nasal decongestant. During the Green Haven phase of his incarceration, Hallett was prescribed increasingly strong pain relievers in connection with complaints of back pain. He was also put on a regimen of medication for his HIV condition, diagnosed with hepatitis, fitted with a prosthetic leg, treated for a neuroma that developed in connection with the use of that leg, and was provided with physical therapy, orthopedic footwear and a TENS unit.

Hallett was placed in the Infirmary upon his May 1997 arrival at Reception. Hallett

---

[1] At the Reception facility, inmates are evaluated for medical problems and they are designated from there to longer-term DOCS placements.

claims that he was physically fit and capable of vigorous exercise, including wheelchair basketball, as well as strenuous work, at that time, and that he was put into the Infirmary solely because of his use of a wheelchair. It is undisputed that Defendant's medical screening staff classified Hallett as "Level One" (a designation indicative of a need for placement in a facility with 24-hour/7day access to medical and nursing staff).

It is also undisputed that, in light of the reason for and length of Hallett's sentence, he was qualified for consideration for designation to DOCS's "Shock Incarceration" ("Shock") program at that time. The Shock program consists of an intensive regimen of physical activity (both work and exercise), substance abuse counseling, and academic training. Successful completion of the program renders an inmate eligible for early release. Plaintiff wanted to pursue the Shock program. He alleges that, shortly after his admission to DOCS Reception in May 1997, two classification counselors informed him that he would be transferred to a facility known as "Lakeview," where the Shock program is conducted. He further alleges that in June 1997, after those conversations, his DOCS counselor informed him in a dismissive way that he "was not going to Shock because [, inter alia,] 'you're in a wheelchair and they don't take wheelchairs'" and he was denied designation to the Shock program.[2] DOCS alleges that the Shock placement was denied for valid medical reasons, in light of Plaintiff's medical history and physical condition.[3] Plaintiff filed grievances and made numerous written complaints and requests to be permitted to participate in Shock, all of which were denied, citing the determination of medical unsuitability. Plaintiff requested, in the alternative, that

---

[2] (Andrew Kent ("Kent") Decl., Ex. A, "Champ Hallett Decl.," at ¶ 38.)

[3] There also appears to be some disagreement as to whether there was a formal Shock denial in that initial period or whether the actual denial came in 1999, on personal history, rather than medical grounds. (Compare Def. Local Rule 56.1 Statement at ¶¶ 12, 24-29 with, e.g., Plaintiff's response to Local Rule 56.1 Statement at ¶ 66.)

he be transferred to the Unit for the Physically Disabled ("UPD") at Green Haven Correctional Facility ("Green Haven"), asserting that he would be able to participate in programming activities there because that facility, unlike the general population areas of the Elmira Correctional Facility, was wheelchair accessible.

Plaintiff was transferred to Green Haven in September 1997 and, after an initial placement in that facility's Infirmary (the reasons for which are again disputed), he was placed in Green Haven's Unit for the Physically Disabled ("UPD"). The nature of Hallett's crime of conviction and the length of his sentence also made him eligible for consideration for Work Release, a program under which inmates are permitted to leave a facility for a certain number of hours a day to work in the community. There is a dispute as to the precise demands of the program in terms of stamina and work types and hours. It is undisputed that there is a medical fitness component of the eligibility analysis.

Hallett claims that he first learned of his eligibility in March 1998, when he was informed that he had been turned down for medical reasons, as a "traumatic amputee." Over the ensuing years, Plaintiff was repeatedly turned down for the program, based principally on determinations by Dr. Bendheim, the physician responsible for the UPD during most of the relevant period, that Plaintiff was medically unfit to participate. Dr. Bendheim's determinations, communicated to the Temporary Release Committee that was responsible for the eligibility decisions, included comments such as "Unable to ever participate - Permanently disabled." (Kent Decl., Ex. C at DEF 613), "Inmate is permanently disabled. He is not capable of participating in [temporary release program]" (id. at DEF 612), and "medically unsuitable for [temporary release.]" (Id. at DEF 595.) Bendheim variously cited Plaintiff's status as a "traumatic amputee," his medication regimen and a complicated set of appointments for medical treatment as reasons for Hallett's ineligibility. Hallett

denies that his physical condition or medical regimens precluded participation, and claims that Bendheim was hostile to and abusive of disabled UPD inmates and specifically stated to him that "'wheelchairs' . . . cannot participate in Work Release" on a number of occasions.[4] DOCS asserts that Bendheim's medical disqualification decisions were premised on valid judgments and were not the product of hostility or animus, disability-based or otherwise. It is undisputed that, after Bendheim was transferred out of the UPD, his successors found Plaintiff medically qualified to participate in Work Release. (See id. at DEF 00590, 00596; Kent Decl., Ex. A, "Champ Hallett Decl.," at ¶ 72; Kent Decl., Ex. J, "Silver Dep." at 34-35.)

## DISCUSSION

Summary Judgment Motion

Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[A]n adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Conclusory allegations, conjecture and speculation are not enough to create a genuine issue of fact. Kerzer v. Kingly Manufacturing, 156 F.3d 396, 400 (2d Cir. 1998). The evidence of the nonmoving party is, however "to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment will

---

[4] (Kent Decl., Ex. A, "Champ Hallett Decl.," at ¶¶ 58-59.)

not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A § 12132 (West 2005). "Disability," as used in the statute with respect to an individual, means

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (c) being regarded as having such an impairment.

42 U.S.C.A. § 12102 (West 2005). A "qualified individual with a disability" is one "who, with our without reasonable modifications to rules, policies or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C.A. § 12131(2) (West 2005). The regulations promulgated by the Department of Justice to implement Title II prohibit public entities that provide "any aid, benefit or service" from denying, on the basis of disability, "a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service." 28 C.F.R. § 35.130(b)(i) (2005); see 42 U.S.C. A. § 12134 (West 2005). The regulations direct public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or

activity." 28 C.F.R. § 35.130(b)(7) (2005). The regulations further provide that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program or activity, unless such criteria can be shown to be necessary for the provision of the service, program or activity being offered." Id., § 35.130(b)(8) (2005).

Title II applies to state prisons, and authorizes suits by private citizens against such public entities for money damages. United States v. Georgia, ___ U.S. ___, 126 S. Ct. 877, 879 (2006). The Supreme Court has held that Title II validly abrogates state Eleventh Amendment sovereign immunity insofar as it creates a private damages remedy for conduct that actually violates the Fourteenth Amendment as well as the ADA, but has not yet spoken to the validity of Title II's purported abrogation of sovereign immunity as to conduct that does not also violate the Constitution. Id., 126 S. Ct. at 882.

The Second Circuit, recognizing the necessity that any private ADA damages remedy against a state be consistent with the authority granted to Congress by section 5 of the Fourteen Amendment, has held that plaintiffs pursuing such damages actions must "establish that the Title II violation was motivated by discriminatory animus or ill will . . . towards the disabled," observing that government actions so motivated "are generally the same actions that are proscribed by the Fourteenth Amendment – i.e., conduct that is based on irrational prejudice or wholly lacking a legitimate government interest." Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98, 111 (2d Cir. 2001). Where there is no direct proof of such discriminatory animus, "a plaintiff may rely on a burden-shifting technique similar to that adopted in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 . . . (1973) or a motivating-factor analysis similar to that set out in Price

Waterhouse v. Hopkins, 490 U.S. 228, 252-258 . . . (1989)." Id. at 112 (parallel citations omitted).

Here, Defendant DOCS contends that it is entitled to summary judgment because Plaintiff cannot put forward a prima facie case of prohibited discrimination and because, even if he could make out such a case, the record could not support a determination that the denials of Shock and Work Release were motivated by disability-based discriminatory animus or ill will. The Court finds that genuine issues of material fact preclude summary judgment in DOCS' favor.

DOCS argues principally that it is entitled to judgment as a matter of law because Plaintiff cannot demonstrate that he was a qualified individual with a disability because, due to the medical problems identified by DOCS, he lacked sufficient physical capabilities and/or stamina to perform the physical requisites of the programs and, with respect to Work Release, the treatment regimen issues identified by Dr. Bendheim also precluded him from meeting program requirements. DOCS affiant Michael Mosher proffers the following description of the Shock program:

> The Shock Incarceration Program uses a militaristic structure, i.e., boot camp style program that includes morning reveille and drill instructors. The days last from 5:30 a.m. to 9:30 p.m., and the work is physically strenuous. Every morning, the inmates assemble for 45 minutes of calisthenics and a half-hour company run over asphalt roads or grassy terrain. . . . All inmates exercise in unison as the routine not only improves physical fitness but reinforces the concept of working together. Routines include cardiovascular and strength exercises such as the knee bender, the lunger, the regular 4 count push-up, and the side straddle hop (jumping jacks). Throughout the day, inmates also march in formation to various program areas within the facility. In addition to physical training, school and drug/alcohol counseling sessions, the inmates work outside on work crews in the community at least three days a week from 8:30 a.m. to 3:00 p.m. Duties include forestry work on State lands (cutting-down tree branches or trees), shoveling snow, and roadside clean-up work (picking-up trash from side of road, etc).

(Michael Mosher Aff. at ¶ 4.) DOCS posits that Hallett was not a qualified individual with a

disability in connection with this program because his amputation and back problems would have precluded him from performing many of the physical activities described above (cutting down tree branches, doing jumping jacks) and he lacked sufficient stamina to perform in the program as described. Although DOCS apparently does not dispute that Hallett made repeated requests to be permitted to participate in the program, it also argues that, because he failed to proffer specific proposals as to reasonable accommodations at the time of those requests, he is precluded from demonstrating in this litigation that his disabilities could have been accommodated.

A person is a "qualified individual with a disability" to the extent he "meets the essential eligibility requirements for . . . participation in programs or activities provided by a public entity." 42 U.S.C.A. § 12131(2) (West 2005) (emphasis supplied). The New York State regulation describing the Shock program does not impose requirements as to specific types of physical activities. Rather, it generally describes the program as

> an alternative form of correctional life stressing a highly structured and regimented daily routine which includes extensive discipline and counseling. The program is designed to be a resocialization and learning period, with inmates expected to participate in considerable physical work, exercise and therapeutic programs.

7 N. Y. Comp. Codes R. & Regs. § 1800.6(a) (2005). It requires that "[t]he daily inmate schedule at each shock incarceration facility will include an early morning regimen of physical training, military style drilling, and cleaning of residence areas, a complete workday, daily group meetings, high school equivalency education, substance abuse counseling and organized physical recreation," but does not provide any further specificity as to the tasks the inmates will be required to perform. Id. § 1800.6(b) (2005).

The Mosher Affidavit purports to describe the Shock program as it was conducted at

relevant times; nowhere in that affidavit or elsewhere in its evidentiary submissions does DOCS proffer undisputed evidence that jumping jacks, cutting down trees and other specific physical tasks described in Mosher's affidavits are essential features of the Shock program. Indeed, Plaintiff's submission includes numerous reports by DOCS to the state Legislature indicating that the physical requirements of the program are not fixed, that the Shock facility at Lakeview, to which Plaintiff sought assignment, has extensive medical facilities, and that involvement in the physical activity features of the program can be tailored to an inmate's ability. In its 1997 Report, DOCS informed the Legislature that

> [a]lthough Article 26-A of the Corrections Law states that Shock shall provide rigorous physical activity, there has never been a uniform standard of what this meant. In fact when it comes to the physical portion of the program there exists a 'sliding scale' of involvement depending upon ability.

State of New York Department of Correctional Services Division of Parole, The Ninth Annual Shock Legislative Report 1997 (Kent Decl., Ex. C at DEF 02770, 02811). In its 1998 Tenth Annual Report, DOCS added the following preface to its explanation of the "sliding scale":

> Since the start of the Shock Incarceration program in 1987 there has been a perception that otherwise eligible inmates with any medical problems would be excluded from participation. This stems from the belief that Shock is exclusively a program of physical exercises.

(Id. at DEF 02873, 02903.) The report continued:

> Over the years the program has sought to expand the number of inmate participants with medical problems. This was primarily accomplished through the creation of Lakeview which standardized medical screening and established a medical infirmary for Shock inmates. As a result, inmates with a wide variety of serious ailments have become successful program participants. These include asthmatics, HIV positive inmates, inmates with sickle cell disease, epilepsy and diabetes.

(Id. at DEF 02904.) Hallett's evidentiary proffers also include his own representations that he had sufficient upper body strength and stamina at relevant times to play basketball, perform vigorous

calesthenics, move rapidly and perform physical work while seated in his wheelchair. The record thus could support the conclusion that program criteria assumptions and/or assumptions about Hallett's capabilities that formed the basis of the challenged exclusion decisions did not go to essential elements of the Shock program and therefore are not preclusive of Hallett's ability to demonstrate that he was a qualified individual with a disability.

Such factual issues are similarly presented with respect to the positions taken by DOCS and its personnel as to Hallett's qualification for participation in Work Release. The relevant regulation describes Work Release as a variety of temporary release that "allows an eligible inmate to leave a facility for up to 14 hours in any day to work or gain on-the-job training." 7 N. Y. Comp. Codes R. & Regs. § 1900.3(f) (2005). (See also Kent Decl., Ex. D at HAL 0182, "Temporary Release Orientation" memorandum.) Defendant principally cites internal Green Haven medical forms querying an inmate's ability to "work [a] full 8-hour day" and Hallett's back pain complaints and anti-HIV and pain medication regimens in arguing that Hallett was ineligible for Work Release. The records produced by DOCS and proffered by Plaintiff in opposition to this motion include, however, two such medical assessment forms on which, in 1999 and 2000, Dr. Bendheim's successors indicated that he was not able to work a full 8-hour day and nonetheless declared him medically able to participate in work release. (See id., Ex. C at DEF 00590, 00596.) These and other portions of the evidentiary submissions, including proffers by Hallett that he was able to self-administer his medications in a way that would not have interfered with Work Release and an affidavit by an inmate who claims to have done part-time Work Release assignments, frame genuine issues of material fact as to Plaintiff's status as a qualified individual with a disability and thus preclude summary judgment in Defendant's favor.

DOCS' position that Hallett's apparent failure to request specific accommodations or

program modifications while he was being refused placement to the programs on medical grounds somehow precludes him from demonstrating in this litigation that his ADA rights were violated is similarly unavailing. There is no evidence in the record that DOCS explained to Hallett contemporaneously the specific medical reasons why its representatives had determined him unfit to participate in these programs, nor is there any indication that Hallett was given the particulars of the program requirements he was thought unable to meet.

It bears noting in this connection that DOCS is not only obligated to make reasonable modifications to its programs where necessary to avoid discrimination on the basis of disability (28 C.F.R. § 35.130(b)(7)) and prohibited from employing "eligibility criteria that screen out or tend to screen out" the disabled unless those criteria "can be shown to be necessary for the provision of the . . . program" (id. § 35.130(b)(8) (2005)), but it is also obligated to "make available to applicants, participants, beneficiaries, and other interested persons information regarding the provisions of [the regulations] . . . and [their] applicability to the services, programs or activities of the public entity, and make such information available to them in such manner as the head of the entity finds necessary to apprise such persons of the protections against discrimination assured them by the [ADA] and [the regulations]." 28 C.F.R. § 35.106 (2005). There is no indication in the record that such notice was provided to Hallett. The facility Superintendent's response to Hallett's queries as to whether his exclusion from Shock was due to his use of a wheelchair and whether such exclusion constituted discrimination was merely that "the grievant does not meet the physical requirements for shock incarceration." (Kent Decl., Ex. C at DEF 00015.) Under these circumstances, where there are questions as to whether DOCS complied with its own duty to give notice of ADA rights and as to whether Hallett had sufficient information to make pertinent accommodation proposals, summary judgment dismissing Hallett's ADA claims is inappropriate.

DOCS also seeks the protection of Eleventh Amendment immunity, arguing that Hallett cannot as a matter of law make the showing, required by the Second Circuit's decision in Garcia, that any compensable ADA violation be the product of disability-based ill will or animus. See 280 F.3d at 111. DOCS' affiants and witnesses represent that Hallett was excluded on the basis of established medical and functional criteria rather than ill will. Hallett has, however, proffered evidence that DOCS representatives told him he would not go to Shock camp "because 'you're in a wheelchair and they don't take wheelchairs'" (Kent Decl., Ex. A, "Champ Hallett Decl.," at ¶ 38) and that he could not go to Work Release because "'they don't send wheelchairs to Work Release'" (Id. at ¶¶ 58-59). Hallett's proffers, together with the other evidence of record that must, at this stage, be read in the light most favorable to Plaintiff, are sufficient to preclude a conclusion as a matter of law that Hallett cannot prove the requisite irrational ill will or animus.

DOCS' summary judgment motion is, accordingly, denied.

Hallett's Motion to Strike Portions of Affidavits

Hallett moves to strike portions of certain of the affidavits tendered by DOCS in support of its summary judgment motion. These portions consist, in the main, of testimony based on inferences drawn from representations as to general work practices in the relevant institutions and administrative offices and from the medical records relating to Hallett's incarceration. Plaintiff seeks to strike such testimony as to the reasons for decisions regarding Hallett that are proffered by witnesses who were not involved in those decisions or who disclaimed any recollection as to how the decisions were made. Hallett also argues that DOCS failed to offer proper authentication of the documents upon which certain of the affiants rely.

Because, as explained above, the record in its entirety is insufficient to support summary judgment in DOCS' favor, the motion to strike is denied. This denial is, however, without prejudice to Plaintiff's ability to challenge the admissibility and/or weight of this or similar evidence in the context of further proceedings in this case.

## CONCLUSION

For the reasons explained above, Defendant's summary judgment motion is denied in its entirety, and Plaintiff's motion to strike certain affidavits is denied, without prejudice to Plaintiff's ability to challenge the admissibility and/or weight of the subject evidenced in the context of further proceedings.

This case will be referred to Judge Peck for settlement purposes. The parties are directed to contact his chambers promptly to request a conference.

The parties shall also prepare for trial, and shall appear for a final pretrial conference before the undersigned in compliance with the Pretrial Scheduling Order issued contemporaneously herewith.

SO ORDERED.
Dated: New York, New York
April 7, 2006

LAURA TAYLOR SWAIN
United States District Judge